Thank you, Counsel. Our third case this morning is Stupak v. Mont du Lac Snowsports. Mr. Cunningham, whenever you're ready. Good morning, and may it please the Court. My name is Taylor Brent Cunningham. I'm appellate counsel for appellant Eric Stupak. His trial counsel is in the gallery with us, along with Mr. Stupak himself. On the day of the incident, Eric Stupak was not a fence-hopping, mischievous trespasser. He was a longtime seasoned pass holder enjoying the amenities at Mont du Lac Resort. After a round of disc golf, which he normally played with his friends, Stupak's friend suggested that they use the tube slides, which were included in their passes. Because they had not used the slides before, they asked the front desk manager at the lodge if they could use it. The manager did not say the slides were closed. He did not say no. He said, quote, I'm not going to say anything, end quote. Based on this response, Stupak and his friends then proceeded to the slides, where access was unrestricted. So there's two issues here. Main issues is expressed consent versus implied consent. It's our position that, at minimum, there is a genuine issue of material fact as to express consent. And I want to focus on what the district court said here. And that was that I'm not going to say anything is, quote, the clear implication of this statement is that Hammond, who was the friend, and his friends, including Stupak, did not have consent to use the slides, but that Schultz, the manager on duty, himself wouldn't tattle about the unauthorized use. I'm not going to say anything is not naturally limited to I won't tattle. An ordinary speech, and I give some examples in my brief, it can also mean I won't object, I won't stop you, or I'm not forbidding it. But under any of those, isn't the underlying implication that the two slides were closed, which is to say that the owners of the resort would not be permitting this? Otherwise, why would you not have to say anything about it? Sure. I will say this. I will say that the record is clear that Mr. Stupak, which we have to accept is true at this point, believed that the slides were open. They had never used the slides before. They didn't know how they operated. They didn't know that there was normally an attendant, that the conveyor belt was running, all of that. Mr. Stupak himself suggested out of abundance of caution that Mr. Hammond and his friend go in to the manager and ask. Even at that point, Judge Stapleson, that Mr. Hammond learned I'm not going to say anything, he meant that he took that to mean it was closed, but he would still proceed. Even if he understood from that that it was closed, that was still permission to proceed. Permission from whom? Permission from the on-duty manager. But if it was closed, isn't the clear implication of that that the owner of the property had closed it to visitors? And that the on-duty manager was simply saying, I'm not going to tell on you to the owner of the property? Well, I think we have to look at it in the context it was set. Again, I go back to my point that it's not naturally limited to I won't tattle or that it's closed in everyday speech. He runs into the lodge and he says, I'm not going to say anything. I think one of the inferences and from the record is clear that he understood that to mean he could proceed, that the group could proceed to the slide. And I think the problem here is I think it would be different, Your Honor, if he had walked up to a different patron and said, do you think we can use the slides? And the patron says, I'm not going to say anything. But that wasn't the case. They went to the on-duty manager, an employee of the lodge, who had apparent authority over the property. And that manager didn't say no. He didn't say the ride is closed. He said, I'm not going to say anything. And I think even if Mr. Hammond understood that to mean the slide is closed, at that point it was permission to use the closed slide. And I think a jury could find the plaintiff's friendly inference that I'm not going to tell anyone with saying, I won't stop you, or I'm not permitting it, or go ahead. So under that theory, the implied consent is not consent to use an open slide. It's the consent to use a slide even though it was closed, is your argument. Yeah, I think it could be viewed both ways by the jury. And I think that's why a jury has to resolve this. I think that's why the standard is you have to take all reasonable inferences in favor of the plaintiff. Here it's not black or white. We have two common people, one a manager running a resort, and one wanting to use the amenities of the resort he paid for. And they're talking. I mean, we're not in a business meeting. It's a, hey, can we use the slides? Can we run these slides? I'm not going to say anything. And they understood that to mean you can proceed. And I think you can say, I think there's two inferences. It could be that the slide was closed, but you can go ahead and use it, or the slide's not closed, go ahead. I think those are two inferences that can be made, fair inferences that can be made by a reasonable person in Hammond and Stupak's position. In the record, it seems like once Mr. Stupak and his friends arrived at the slides, that the tubes on which they would slide down were kind of spewing about. Is that correct? That's correct. So in the record, it shows that the manufacturer of the slide, I think it's called M-Snow, the manufacturer guide there says that the tube should be locked up or tied up. Do you know in the ordinary course whether the resort tied up the tubes and they just didn't happen to do so on that occasion? I'm sorry, and I cannot remember if that's in the record, but I believe that's true, that they had the option to lock or tie them up. The tubes were just all over the slide hill, just picked up and ready to use. So one of our arguments is that a jury could find that I'm not going to say anything is express consent. However, if you want to get to an implied consent analysis, which was also argued below, not only do you have the manager's words. So when you get to the slides, there was a ride close sign, and the picture's on page 8 of my brief. There's a ride close sign on a chain, and it goes across the entryway to the platform so you can go down the slide. That was unclipped and off to the side. So even in a case like Zillmer where the court pointed out and the district court relied on that, hey, there doesn't have to be a sign saying ride closed. Well, that's not true here. It wasn't that there wasn't no sign at all. There was a sign, a ride close sign, and it was unchained and on the floor. Was there an explanation during discovery as to why the close sign wasn't draped across the entrance? No, Your Honor. I think the natural implication is someone didn't do their job. Didn't do their job in picking up and collecting the tubes and locking them up, and didn't do their job in putting the close sign up. So one of the defendant's arguments is that the blue bumpers along the slide were not inflated. That's correct. They were clear that they were inflatable bumpers, at least by their telling, and the fact that they weren't inflated would inform anyone that they shouldn't ride the slide. And what is your response to that? What I will say is that's the defendant's response. As the record indicates from the plaintiff and his friends, now let's stick with Stupak himself. Stupak noticed the blue bumpers going down the slide. The record says he believed, to reiterate, he had never seen this operated before. He had never seen them inflated. That's why he took the caution of going in first and asking the manager or sending his friend in to ask the manager. He understood those to be sticky, the uninflated blue inflatables. That's what the record said. He thought those were like a sticky substance, so the tube couldn't go off the slide. That's what he understood those to be. Nothing said that they were inflatable. He hadn't seen them inflate before. So that's our answer to that. That's the inference or the facts viewed in light most favorable to the plaintiff. Mr. Cunningham, can I ask you some questions about recklessness? So let's say he was trespassing, right? The resort still has a duty not to be reckless. Yes. And your argument is that the manager saying, I'm not going to say anything, was reckless. Yes.  And I'm wondering, that doesn't sound implausible to me, your argument, and I'm wondering if you can point to evidence in the record, though, that supports that the manager knew or should have known that if he tacitly encouraged them to go on this closed ride, that harm would result. I think, and maybe my friend on the other side can correct me if I'm wrong, I don't think that point was developed, but I think should have known is the inquiry here. He was the manager. He wasn't the cleaning, you know, cleaning staff or maintenance. He was the on duty manager. And if he believed in his clothes as the defense. Excuse me. Did you just say the standard under recklessness is should have known of the risk. I think it's known or should have known your honor. Would have known is I guess I generally associate that with a negligent standard. Is there something special about Wisconsin law on this subject? No. I think we're in a negligence case. Judge Peebleson asked you about recklessness. She did. And she asked about should known or should have known. And I'm saying, I think the owner or the on duty manager should have known. And the defendant's position is that the on duty manager knew that the ride was closed. And presumably if he knew it was closed, he knew the bumpers weren't inflated. Well, he was deposed, right? Did anyone ask him? I'm hoping my friend on the other side can help me. I do not think that is in the record. So if that's not in the record, if we don't have evidence of recklessness in the record for the manager making this statement, how does that cut at the summary judgment posture with respect to your case? Well, I think we do have in the record that he said, and it's the defense position that he knew it was closed or that the manager knew it was closed and that he said, I'm not going to say anything. And I think in that of itself, knowing it was closed and that I'm not going to say anything is evidence enough of recklessness. But there's no evidence that you can think of that he knew or consciously disregarded a risk that harm would result from riding the closed ride. I think that's a natural inference that has to be taken in favor of plaintiff. A natural inference that you're drawing from what evidence? That he knew the ride was closed and that he said, I'm not going to say anything. Meaning one could take it, a jury could take it to mean, I know it's closed and the inflatables are not up, but go ahead and proceed at your own risk. Was there evidence that he knew, for example, that the inflatable bumpers are usually like are inflated when it's on, but they're off when it's closed? I believe that's in the record. Yes, Your Honor. In his deposition? In his deposition. And then there's a statement of facts that each party submitted to the district court under local rule. And I want to like to save the time for rebuttal. Thank you, Mr. Cunningham. Thank you. Ms. Chielkowski. Thank you, Your Honor. I want to start by making clear that Mr. Stupak's subjective belief is not the standard here. That is totally irrelevant. And the district court correctly noted that this is an objective test in terms of what a reasonable person would assume based on all of the circumstances that they were faced with. And so when the district judge looked at the facts that were in the  he basically concluded the only thing that cuts in plaintiff's favor is assuming that Mr. Schultz said, I'm not going to say anything. On the balance, on the other side of the scale, you had basically every other thing in the record, which included that Stupak and his friends apparently conceded that they would have needed permission. And that's why they sent someone in to ask Mr. Schultz. And the judge specifically said their request for permission basically negates any inference that they thought the slide was obviously open. There's no. And yet when they get to the slide, these, the chain that says slide clothes is not there, right? It's off to the side. That is a disputed fact. So for purposes of this, we have to assume that was on the side. Everyone from Mandela testified that it was up and the photographs from the scene show it was up. But for purposes of this, we have to assume it was on the side, which would be similar to the Zillmer case where there was also evidence that typically there was a barrier across the air, the entrance to the file off that said restricted don't keep out. And there was a dispute effect in that case as to whether the rope was down at the time that they went up there, the court said, that is not enough. The fact that there was typically a barrier and that barrier was not present does not lead to the reasonable person thinking they had permission to go. Did the plaintiff in the Zillmer case, did they see the rope off to the side or the rope was just not there? I believe that they testified the rope was not there, that it maybe had been there earlier in the evening, but was not there when they went up. Isn't that different though from, you know, cause the plaintiff presumably in that case would know whether or not there should be a rope or not. But here you have a cloak. If you take their out, you know, assertions to be true, you have a close sign that has kind of just put off to the side. That seems to be a material distinction between this case and Zillmer. I don't think so when you look at all the factors. And so the judge went on to say that this is clearly the kind of amusement that would be attended by attendees, which everybody testified that yes, in fact, when they were open, there was a minimum of one and frequently two people working the slides, making sure that they were clear. I mean, that's the other thing. You can't see from the top of the slide when someone has finished the slide and is off to the bottom. So it's obvious you need someone who's saying, you're clear, you can now go. The other person has cleared the way. And so the judge said the fact that when you look at the fact that there were no attendance, the conveyors were turned off, which were there to take people up to the top of the hill, which is about 400 feet up the hill. Nobody else was using the slides the entire afternoon. When they had been there, there was nobody using the slides. And that there was no evidence that Mondalok had ever permitted anyone to use the slides when they were not open. And indeed they testified, we've never had anyone try to go on these things when they're not in service. Well, but let's, let's assume that, that the Mr. Stupak and his colleagues thought, subjectively believed that the site was closed, right? Subjectively believed it was closed? Right. They thought it was closed. And so they go to the general manager and the general manager goes, well, you know, I'm not going to say anything. And they go to the slide and say, the slide was barricaded by a big fence and a gate, right? That was locked, right? And that wouldn't, they're kind of a reasonable person considered those facts to be slightly different than when they get to the slide, there are no, you know, nothing impeding them from going to the top. The sign is off to the side. There, you know, inner tubes kind of spin around everywhere. That seems like those facts, a reasonable jury can kind of look at those facts differently than a situation where even where the manager says, I'm not going to ask, it's absolutely clear that they should not use the slide because there's a barbed wire fence or whatever that they can't climb over. And so at that point, a reasonable person in that factual situation might say, you know what, the manager says that, but you know, that, that guy's just kind of office, you know, office rocker today. Right. But that's not what we have here. What we have here is, I mean, you have to look at all of the facts and I'm wondering, and I think that's Mr Cunningham's point that if you look at all of the facts then you have to, that goes into how a reasonable person might weigh what the manager told them. And I'm wondering if you could respond to that. Absolutely. So I think if you look at the case law, there are multiple cases that present similar fact patterns where something wasn't barricaded. There wasn't necessarily a no trespassing sign. There wasn't necessarily something that would make it clear to someone that they shouldn't go there. And the courts have consistently held someone's misunderstanding or confusion about whether they were permitted to go someplace cannot create consent. But in those cases you didn't have someone authorized to speak on behalf of the facility manager, kind of giving them a wink and saying I'm not going to tell anyone if you go. And that is something I did want to call out as well. Plaintiffs repeatedly use that quote. I'm not going to tell anyone. Nobody said that. And the fact that they repeatedly misquote what was actually said, I think is somewhat telling as are their hypotheticals. Sorry. What, what the purposes of summary judgment at this point, right? Where we're assuming that the factual inferences in the plaintiff's favor, what do you think is the exact correct quote? The exact quote according to Mr Hammond, who is the only person that they said mattered was I'm not going to say anything. That was the quote that he said. And instead of using that language repeatedly, they say, I'm not going to tell anyone now, whether you think those are the same word or different statements, nobody said, I'm not going to tell anyone. And so this, as the judge said, and he can certainly consider that. He considered the fact that there were tubes out and to be clear about the record, the manager testified that at that time, they did not lock up the tubes, that that was something they started doing after Mr. Stupak's accident. But at the time that was not their practice to lock up the tubes. And if you look at the property as a whole, there are campsites, there's a lodge, there are people that stay overnight there. And they testified frequently. The kids would just take the tubes back to their campsite and, you know, use them again the next time it was open. So after this, they started locking up the tubes, but that was not something that they did at the time of Mr. Tupac's accident. They did, however, always use the conveyors to take people up and they always had people staffing when they were open. And so I think objectively they were closed. I mean, there is not anything in the record that would say they were open. So that really what we're looking at here is Mondelec's behavior and whether their behavior would have given a reasonable person belief that they had implied consent to use the slides. I also wanted to correct council statement that Mr. Stupak testified. He thought the blue parts might be sticky. He didn't know what they were and he testified. I didn't know what we asked specifically, what would keep you on the slide looking down this thing? I don't know. I thought maybe they were sticky. He didn't know. He didn't know how to touch them to see if they were, he didn't do any sort of investigation to find out how he would stay on the slide and testified. He didn't know how he would stay on. Can I ask you some record questions about recklessness? Again, a lot of the same evidence that you're pointing to and that you're arguing means there was a trespass might also though support a finding of recklessness, which is to say, you know, a jury might think it was reckless for your front desk manager to say, I'm not going to say anything and tacitly encourage these guys to ride the closed slide given the dangers inherent in the closed slide, right? The uninflated bumpers, et cetera. Is there, can you point us to any record evidence that bears on that recklessness question? You know, for example, what did the desk manager know about the condition of the slides when they were closed versus open? I don't believe he was asked any of those questions which may have made somewhat sense because he testified. I said, no, they said, can we do it anyway? I said, no. So I don't think council then proceeded to ask him any of the questions about, you know, what would you have done if you knew they were going to go do it anyway? I don't think they asked any of that kind of stuff. The record is clear that no one had ever done it before, so they certainly had no experience with anyone attempting to go down the slides when they were closed. Um, and as to your question about recklessness, I think the case law is clear that when someone is a trespasser, that the mere failure to object is insufficient to create consent. Yeah, but this is more than on their theory. I think you, you know, this is more than a mirror. It's more than silence saying I'm not going to say anything is a sort of tacit endorsement of this plan. I think if you read Mr. Hammond's testimony, um, he specifically said when he said, I'm not going to say anything. And when he was then asked, well, what did you tell the others when you went back outside? And he said, I, I said it was affirmative that we had been given permission, um, and that the gentlemen in the main Chalet had not raised any objections. So again, it's almost the exact language from the case law that says rate, not raising an objection is not enough to give consent. The other thing I think is, are you saying there that it, that all we should focus on is the message that specifically conveyed to Stupak? No, I think that's completely irrelevant because that's what, that's what you're talking about though, right? What Hammond said to, but that was Hammond's own description of how he interpreted what had happened in the Chalet. Um, and specifically with Mr. Stupak, when we asked him, if you had been told rather than, I think that record is clear that Mr. Hammond did not accurately convey what he was told. There's no question about that. And Mr. Stupak was asked, if you had been told by Mr. Hammond, what was actually, he claims was said, which is, I'm not going to say anything. Would you have interpreted that as permission? And Mr. Stupak said, I don't, I'm unsure. So even he wouldn't have necessarily taken that as permission. And again, his subjective belief is not relevant. What's relevant is looking at all of the circumstances, which has the district court sort of laid out everything on the property. And the other thing to keep in mind about this property is that it's hundreds of acres with all kinds of different activities. There's archery, there's water features, there's the sliding hill, there's all kinds of different things, all of which had their separate posted hours. And that was, I think, another thing that mattered to the district judge. All of these things were publicly accessible. They could have looked at any of the hours posted and known it was closed. And the other thing that Mr. Stupak definitely knew is that using these facilities required signing waivers. And he had done that the prior year. He had signed waivers for all of the different activities that were offered at Mondelec. And this year he had not done that. He had never signed any of the waivers. He had never come into the chalet to pick up his pass. So all of the things he knew he was supposed to do, he had not done any of them. Would those waivers have precluded this lawsuit? If he had signed it, I think so, Your Honor. And I think moreover that the statute, and we argued this as an alternative basis for affirmance, the statute has different sections. Part of it dictates the behavior of the landowner, and part of it dictates the behavior of the patrons. And it goes through a whole list of things under assumption of risk, that if you choose to partake in these activities, you assume the risk of various harms. And that's laid out in both Wisconsin Statute 167.33 and 895.526. They lay out all of the things that can go wrong, because we know these activities do have some inherent risks. And so the legislature has made a determination that, presuming that the landowner has done what they're supposed to do, that those kinds of suits are barred. If you don't have any other questions, I'll... Judge Hamilton, anything? No, thank you. Thank you, Your Honor. Mr. Cunningham? Thank you. I want to first, by noting there was a lot of talk about this being an objective inquiry, 100% agree. But the objective inquiry is, would a reasonable person under the facts and lived experience of the plaintiff, if that person was reasonable, would that person have been reasonable in those specific circumstances? It's not some amorphous, you know, someone goes to a slide. It includes everything. I'm not going to say anything. The ride close sign down, the tubes about. A reasonable person in all of those specific circumstances would believe that they had expressed or implied permission to use the slides. So I want to make that clear. The cases that were talked about, both in this court and below, Grossenbach, McNally, and Monsivius, those don't share any parallels with this case. Mr. Stupak was not confused. He didn't enter an unlit room, or an unmarked room, or a room that said no employees. He was a seasoned pass holder. That pass included access to the slides. Slides that he had never used, wanted to use, took the precaution to go in and ask whether they could be used, received the answer he did, went to the slides, ride close sign down, tubes about, ready to use. This is just nothing like those cases where the court held there was no fact issue. I will say that the no attendance testimony all came from defense witnesses. Those did not come from the friend group. They did not know attendance usually were at the slides when they were open, or that the guards were inflated. We ask the court to reverse and remand because this case is for a jury. Thank you. Thank you, counsel.